# *UNITED STATES MAGISTRATE JUDGE*
# *U.S. DISTRICT COURT BUILDING*               *UNDER SEAL*
# *WASHINGTON, D.C.*

PLEASE ISSUE:      [   ]  Arrest  [ **X** ]  Search  [ **X** ]  Seizure

|  |  |
|---|---|
| Warrant for: | ELEVEN ELECTRONIC DEVICES CURRENTLY IN THE POSSESSION OF THE UNITED STATES POSTAL INSPECTION SERVICE |

Violation:      **[ ] D.C.C.**        **[X] U.S.C.** Title:   **18**

Section(s):     **18 U.S.C. § 371**
                **18 U.S.C. § 1349**
                **18 U.S.C. § 1341**
                **18 U.S.C. § 1343**
                **18 U.S.C. § 1512**
                **18 U.S.C. § 1519**


 /s/ Jessee Alexander-Hoeppner          May 6, 2020
L. Rush Atkinson                        Date
Assistant Chief, DOJ Criminal Fraud Section
Tel: (202) 305-7413
lawrence.atkinson2@usdoj.gov
Jessee Alexander-Hoeppner
Trial Attorney, DOJ Criminal Fraud Section
Tel.: (202) 305-3048
Mobile: (202) 230-0668
jessee.alexander-hoeppner@usdoj.gov

Bond: **_____N/A_____**

_____

COMPLETE FOR ALL ARREST WARRANTS:

*The following information must be provided for ALL arrest warrants and an **original** and **duplicate** of this form must be submitted to the Clerk's Office with the warrant papers.*

Officer / Agent Name: Jan Bodon, JGBodon@uspis.gov

Badge Number: 5852

Agency / Unit: United States Postal Inspection Service

24 Hour Telephone Number: (817) 287-8929
 (For officer/agent)

AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 1:20-sw-00122-1 |
| ELEVEN ELECTRONIC DEVICES CURRENTLY IN THE POSSESSION OF THE UNITED STATES POSTAL INSPECTION SERVICE | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated herein by reference and made a part hereof.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 371, 1349, 1341, 1343, 1512, 1519 | Conspiracy; Mail Fraud; Wire Fraud; Obstruction of Justice |

The application is based on these facts:

See Attached Affidavit in Support of An Application for a Search Warrant, which is incorporated herein by reference and made a part hereof.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 08/04/2020 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jan Bodon, United States Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 05/06/2020 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

Magistrate Judge G. Michael Harvey
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ❑ Original          ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.   1:20-sw-00122-1 |
| ELEVEN ELECTRONIC DEVICES CURRENTLY IN | ) | |
| THE POSSESSION OF THE UNITED STATES | ) | |
| POSTAL INSPECTION SERVICE | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

       An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A, which is incorporated herein by reference and made a part hereof.

       I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B.

      **YOU ARE COMMANDED** to execute this warrant on or before _____ May 20, 2020 _____ *(not to exceed 14 days)*
   ❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

      Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

      The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Magistrate Judge G. Michael Harvey _____ .
                                     *(United States Magistrate Judge)*

   ☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ❑ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____ 08/04/2020 _____ .

Date and time issued: _____          _____
                                                      *Judge's signature*

City and state:  Washington, D.C. _____          Magistrate Judge G. Michael Harvey
                                                     *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   1:20-sw-00122-1 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

                                   _____
                                            *Executing officer's signature*

                                   _____
                                               *Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ELEVEN ELECTRONIC DEVICES CURRENTLY IN THE POSSESSION OF THE UNITED STATES POSTAL INSPECTION SERVICE | Case No. 1:20-sw-00122-1 <br><br><br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jan Bodon, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a United States Postal Inspector and have been employed by the United States Postal Inspection Service ("USPIS") since April 17, 2004.  As a Postal Inspector, I am responsible for the investigation of violations of United States law, including violations of Title 18 of the United States Code.  My duties include investigating cases related to mail and wire fraud, specifically the use of the mails to commit fraud or to further a fraud scheme.  I have attended specialized training courses in mail fraud and in gathering and reviewing electronic evidence.  I am presently conducting various investigations of fraudulent investment schemes. Many of the investigations I have conducted have involved electronic evidence, including e-mail records, and I have sworn out search warrants previously.

2.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search a eleven electronic devices received by the United States Department of Justice in April 2018 (hereinafter, the "Devices"). The Devices are currently in the custody of USPIS in Washington, D.C.

3.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training and

experience.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

4.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court "is in or for a district . . . in which the wire or electronic communications, records, or other information are stored."  18 U.S.C. § 2711(3)(A)(i).

## **PROCEDURAL HISTORY**

5.     I submit this affidavit in order to seek a search and seizure warrant for

- An electronic storage device with serial number NA9J9K6K;

- An electronic storage device with serial number NA8RRXFX;

- An electronic storage device with serial number NA8RRXH1;

- An electronic storage device with serial number NA8QL484;

- An electronic storage device with serial number BZCY10900080;

- An electronic storage device with serial number NA9F4XCT;

- An electronic storage device with serial number L3-H5063;

- An electronic storage device containing seven hard drives with serial numbers WCAV2W912434;  Z4Y8GKTL;  JP1470HE3H4XAL;  6RYLANRE;  N035S7EV; Z4Y8GKFS; and Z4Y8GF70;

- A Sandisk USB device;

- An electronic hard drive with serial number 2K231B07009D5; and

2

- An electronic hard drive with serial number 0JA011333F,

(hereinafter, the "Devices"). The Devices are currently in the possession of USPIS and are located in Washington, D.C. As described in greater detail below, the Devices have been in the possession of USPIS since in or around April 2018. Since coming into USPIS's possession, USPIS made a forensic copy of the Devices to ensure data integrity and allow for subsequent examination. Neither the Devices nor the data on them have been altered.

6.     I hereby incorporate by reference the search and seizure warrant authorized by United States Magistrate Judge for the District of Columbia Michael G. Harvey on or about May 25, 2018 and affidavit submitted in support thereof (*In the Matter of Search of Select Electronic Devices, Storage Units, and Databases Currently in the Possession of the United States Postal Inspection Service*, case number 1:18-sw-00135, included as Attachment C). As detailed in Attachment C, the government has identified evidence of a scheme by individuals associated with Forefront, a group of related investment companies located in New York, to defraud North Carolina Mutual Life Insurance Company ("NCM"). Specifically, there is probable cause to believe that Forefront-associated individuals, led by Forefront's founder and CEO, BRADLEY REIFLER, and others, engaged in a scheme to defraud NCM by (1) making materially false representations to NCM, through NCM's resinurer, about what investments were being made using NCM's trust assets; and (2) misappropriating at least some of the NCM trust assets to repay Forefront's clients who had invested in unrelated investment vehicles.

<u>Reifler's Purported Deletions and Premises Searches</u>

7.     As detailed in paragraphs 59 through 77 of Attachment C, in or around 2018, the government received information indicating that REIFLER was attempting to delete electronic information pertaining to the scheme to defraud NCM. Further, in or around March 2018, through

discussions with Forefront's counsel, the government learned that Forefront planned on vacating its offices, then located at 641 Lexington Avenue, New York, New York, 10022 (the "Forefront Office"), in short order.

8.      Upon learning of these developments, the investigative team applied for search warrants for the Forefront office and REIFLER's home property, located at Sky Blue Farm, 123 Fraleigh Hill Road, Millbrook, New York, 12545.  On April 12, 2018, Magistrate Judge Robert W. Lehrburger of the United States District Court for the Southern District of New York issued search warrants, which were executed that same day.  Judge Lehrburger authorized the government to search both premises for electronic data and documents, electronic conversations, internet conversations to include messages and chats, text messages, files, images, and calendar entries, computers, storage media, routers, modems, and network equipment.  Judge Lehrburger also authorized the search and seizure of documents, records, and accounting statements from the Forefront Office.  Pursuant to these search warrants, the government obtained paper records, electronic media, and electronic devices.

9.      Because Forefront was in the process of vacating the Forefront Office, many of the electronic devices previously maintained at the Forefront Office and REIFLER's home, including devices that may have been subject to REIFLER's deletion efforts, had already been removed from the premises and could not be obtained through the search warrant.

<u>Creation and Production of the Devices</u>

10.      Upon learning of REIFLER's attempts to destroy evidence, Department of Justice prosecutors contacted Forefront's counsel in or around March 2018.  In these discussions, Forefront's counsel agreed to create a forensic image of a Forefront computer server and other

electronic devices located at the Forefront premises in response to the government's concerns regarding spoliation of evidence.

11.     Subsequent to the searches of the Forefront Office and REIFLER's residence, in or around April 2018 Forefront's counsel produced the Devices to the government, which counsel identified as containing the Forefront server and other relevant electronic data.  Upon production, USPIS took custody of the Devices.

12.     In addition to producing the Devices, Forefront's counsel produced what it identified as an inventory of the data contained on the Devices.  The inventory listed twenty-six categories of electronic evidence purportedly contained on the Devices, which included data recovered from electronic devices and information associated with REIFLER and/or Forefront that were not recovered through the search warrants.

<u>The May 25, 2018 Warrant to Search Data on the Devices</u>

13.     In May 2018, the government sought a warrant from this Court to search data it believed to be on the Devices, based on the inventory supplied by Forefront's counsel. Specifically, the government sought a warrant to search six of the twenty-five categories of data outlined on the prepared inventory: (1) a copy of the server formerly located at the Forefront Office; (2) a forensic image of the server made by Forefront counsel; (3) a forensic image of a laptop used to access the Forefront server; (4) Office 365 email data; (5) a cloud-based storage device for DropBox data from REIFLER; and (6) a cloud-based storage device containing general ledgers for Forefront on QuickBooks.  On May 25, 2018, Magistrate Judge Harvey authorized a

warrant to search the six categories of data for evidence of the scheme allegedly led by REIFLER and others at Forefront.  The May 25, 2018 warrant is included in Attachment C.

14.     Upon Magistrate Judge Harvey's issuance of the search warrant, members of USPIS accessed the Devices in order to begin the review pursuant to the warrant.  However, upon the initial review, the government could not fully determine which files on the Devices corresponded to which items on the inventory and, therefore, which items the search warrant authorized the government to search and seize.

15.     Upon discovering the mismatch between the inventory and the actual file structure of the Devices, the government decided to search only data taken from the Forefront server, which was easily identifiable within the production.  On or about December 2018, the government filed a notice with this Court (included herein as Attachment D[1]), announcing its intent to search only the server.  The government then reviewed the data taken from the Forefront server pursuant to the Court's prior authorization.

16.     The government has not searched the server or the remainder of the data on the Devices.  However, the government still believes there is probable cause to believe that evidence of the Forefront fraud scheme exists on the remainder of the Devices (as did Magistrate Judge Harvey when he issued the search and seizure warrant on May 25, 2018).  As described below, the

---

[1] Exhibit 1 to the notice, which contained the May 25, 2018 application, warrant, and affidavit, has been omitted to avoid duplication with Attachment C.

government now seeks the Court's authorization to search the full Devices for evidence of the Forefront fraud scheme.

### THE GOVERNMENT'S CONTINUED INVESTIGATION

17.     In the intervening period since May 2018, the government has continued to investigate the matters set forth in this Affidavit.  Through its investigation, the government has identified additional evidence, including but not limited to the following:

18.     The government interviewed Joel Schreiber ("Schreiber") of Waterbridge Capital, LLC ("Waterbridge") in or around November 2018 and again in or around January 2020. Schreiber shared a physical office with Forefront and received loans from REIFLER and Forefront in or around 2015.  During his interview, Schreiber identified certain documents that NCM had received from Forefront as forgeries.

   a.   During the investigation, the government recovered promissory notes, security agreements, and other supporting documentation provided by Forefront to NCM. These documents made it appear that entities associated with Schreiber received loans of over $10 million from an entity called the "Port Royal North Carolina Mutual Reassurance Trust" in or around 2015.

   b.   During the interview Schreiber reviewed promissory notes, agreements, and other materials given to NCM by Forefront.  Schreiber indicated that much of the documentation appeared to be fraudulent.  In particular, many documents appeared to contain forged or copied instances of Schreiber's signature, and Schreiber was unfamiliar with many of the entities that were purportedly linked to him.

   c.   For example, one such document referenced a loan from the Port Royal North Carolina Mutual Reassurance Trust for $1 million to an entity called "2307

Broadway LLC" on or about August 14, 2015.  Schreiber did not recognize this entity and did not recall signing such a loan or authorizing anyone to do so on his behalf.

19.     The government interviewed Andrew Whiteside ("Whiteside") of SprintShip, LLC in or around July 2018 and in or around October 2018.  Whiteside previously had worked with Forefront to raise capital for SprintShip, LLC and, in or around October 2015, Forefront assisted him in securing a loan for $250,000.  During his interview, Whiteside identified certain documents that NCM had received from Forefront as forgeries.

a.     During the investigation, the government recovered and reviewed a security agreement, promissory note, and supporting documentation provided by Forefront to NCM.  These documents purport to show that SprintShip LLC received $1 million from an entity called the "Port Royal North Carolina Mutual Reassurance Trust" in or around October 2015.  Many of these documents appeared to contain Whiteside's signature.

b.     Whiteside reviewed these documents and informed the government that he had never heard of the Port Royal North Carolina Mutual Reassurance Trust; that he had not signed these documents; and that SprintShip had not received a $1 million loan through Forefront or the Port Royal North Carolina Mutual Reassurance Trust.

20.     The government is conducting an ongoing tracing analysis of Forefront bank account records.  This tracing analysis demonstrates that REIFLER and Forefront misappropriated portions of NCM's funds.  For example, on or about April 30, 2014, Forefront transferred $10,000,000 of NCM's funds to an account in the name of Forefront Partners Short-Term Notes. Between approximately May 1, 2015 and October 30, 2015, more than $2,500,000 was transferred

from this account to Forefront Capital Services, an entity with the purpose of funding payroll and overhead expenditures related to Forefront's operations.  At no time had NCM or any other entity permitted Forefront to use NCM's trust assets for any business expenses.

## AUTHORIZATION TO SEARCH ALL DEVICES

21.     For the reasons set forth above—most importantly, the inability to readily distinguish the sources of data found on the Devices provided by Forefront's counsel—the government requests the Court authorize a warrant permitting the government to search the entirety of the Devices provided by Forefront's counsel in April 2018.  The government also requests authorization to seize the items and records articulated in Attachment B to the present warrant.

22.     I have reviewed the articulation of probable cause set forth in the affidavit executed in support of the warrant issued on May 25, 2018 by Magistrate Judge Harvey.  The articulation of probable cause is found in paragraphs 8 through 77 of the affidavit, attached hereto as part of Attachment C.  To the best of my knowledge, the articulation of probable cause is true and accurate, and I do not at this time have any corrections or amendments to its articulation.

23.     As described above, the Devices are in the custody of USPIS and have not been altered in any way since its receipt in or around April 2018.

24.     Because forensic examiners will be conducting their search of the Devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## REQUEST FOR SEALING

89.     It is respectfully requested that this Court issue an order sealing, for a period of 90 days until August 4, 2020, all papers submitted in support of this application, including the

application and search warrant.  I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation involving, among other things, suspected obstruction activities.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation, could lead to further deletion and spoliation of potential evidence, and may severely jeopardize the investigation's effectiveness.

## **CONCLUSION**

90.    Based upon the information above, I have probable cause to believe that the Devices contains evidence, fruits, and instrumentalities of a conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, and destruction, alteration, or falsification of records in Federal investigations and bankruptcy, under Title 18, United States Code, Sections 1519 and 1512.  Therefore, I respectfully request that the Court issue a search warrant to search the evidence described in Attachment A and seize the items described in Attachment B.


Respectfully submitted,

_____
Jan Bodon
United States Postal Inspector


Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on May 6, 2020.


_____
Honorable G. Michael Harvey
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

**Devices to Be Searched**

The electronic devices provided by Forefront counsel to the United States Postal Inspection Service in around April 2018 and currently located in the custody of USPIS in Washington, D.C. These devices include

- An electronic storage device with serial number NA9J9K6K;

- An electronic storage device with serial number NA8RRXFX;

- An electronic storage device with serial number NA8RRXH1;

- An electronic storage device with serial number NA8QL484;

- An electronic storage device with serial number BZCY10900080;

- An electronic storage device with serial number NA9F4XCT;

- An electronic storage device with serial number L3-H5063;

- An electronic storage device containing seven hard drives with serial numbers WCAV2W912434; Z4Y8GKTL; JP1470HE3H4XAL; 6RYLANRE; N035S7EV; Z4Y8GKFS; and Z4Y8GF70;

- A Sandisk USB device;

- An electronic hard drive with serial number 2K231B07009D5; and

- An electronic hard drive with serial number 0JA011333F.

**ATTACHMENT B**

**I.      Information to be seized by the government**

The items to be seized include the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 1341, 1343, 1349, 1512, and 1519 between September 1, 2014, and present, described as follows:

1. All data, documents, records, accounting statements, electronic mail, internet conversations to include messages and chats, text messages, files, images, and calendar entries relating to the following:

    a. North Carolina Mutual Life Insurance Company, including the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement;

    b. The trust assets held or purported to be held pursuant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement and any related investments or collateral;

    c. The external and internal audit of the trust assets held or purported to be held pursuant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement, to include any communications with or concerning the North Carolina Department of Insurance and Dixon Hughes;

    d. The Forefront short-term note program and any investments related thereto;

    e. Any records bearing on the validity of the signatures on the Investment Advisory Agreement, Stamford Brook Letter, promissory notes, security agreements, and any

other signed agreements relevant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement;

f.  Any motive to enter into the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement or defraud any parties connected thereto, including but not limited to the financial condition and liquidity of Forefront or its principals;

g.  Any attempts to delete, conceal, or otherwise withhold records and data, to include Electronically Stored Information, related to the SEC investigation and bankruptcy proceedings involving Bradley REIFLER, and the foregoing matters, and any other attempts to obstruct a Federal proceeding.

2. Evidence of who used, owned, or controlled the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3. Evidence of software that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4. Evidence of the lack of such malicious software;

5. Evidence indicating how and when the Devices were accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

6. Evidence indicating the Devices user's state of mind as it relates to the crime under investigation;

7.  Evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

8.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Devices;

9.  Evidence of the times the Devices were used;

10. Passwords, encryption keys, and other access devices that may be necessary to access the Device;

11. Records of or information about Internet Protocol addresses used by the Devices;

12. Records of or information about the Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

13. Contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Select Electronic Devices, Storage Units, and Databases<br>Currently in the Possession of the United States Postal<br>Inspection Service | )<br>)<br>)<br>)<br>)<br>) | Case: 1:18–sw–00135<br>Assigned To : Magistrate Judge Harvey, G. Michael<br>Assign. Date : 5/25/2018<br>Description:  Search & Seizure Warrant |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ Columbia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A and B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 371, 1349 | Conspiracy, Mail Fraud; Wire Fraud; Obstruction of Justice |
| 18 U.S.C. §§ 1341, 1343 | |
| 18 U.S.C. §§ 1512, 1519 | |

The application is based on these facts:

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days (give exact ending date if more than 30 days:  08/23/2018  ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Bryan Masmela, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence.

Date: MAY 25 2018 _____

_____
*Judge's signature*

City and state: District of Columbia _____

G. MICHAEL HARVEY
U.S. MAGISTRATE JUDGE
*Printed name and title*

3  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Select Electronic Devices, Storage Units, and Databases<br>Currently in the Possession of the United States Postal<br>Inspection Service | )<br>)<br>)<br>)<br>)<br>)<br>) | Case: 1:18–sw–00135<br>Assigned To : Magistrate Judge Harvey, G. Michael<br>Assign. Date : 5/25/2018<br>Description:  Search & Seizure Warrant |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____ District of _____ Columbia _____
*(identify the person or describe the property to be searched and give its location)*:

    See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before        6/8/18        *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to    G. Michael Harvey    .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*    ☑ until, the facts justifying, the later specific date of        08/23/2018        .

Date and time issued: ___ MAY 25 2018 / 3:25pm ___ _____
                                                                                      *Judge's signature*

City and state: ___ District of Columbia ___   ___ G. MICHAEL HARVEY ___
                                                                 ___ U.S. MAGISTRATE JUDGE ___
                                                                                *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF Select Electronic Devices, Storage Units, and Databases Currently in the Possession of the United States Postal Inspection Service | Case: 1:18-sw-00135 Assigned To : Magistrate Judge Harvey, G. Michael Assign. Date : 5/25/2018 Description:  Search & Seizure Warrant |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Bryan Masmela, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I am a United States Postal Inspector and have been employed by the United States Postal Inspection Service ("USPIS") since February 2003.  As a Postal Inspector, I am responsible for the investigation of violations of United States law, including violations of Title 18 of the United States Code.  I am currently assigned to the Department of Justice Mail Fraud Team and my duties include investigating cases related to mail and wire fraud, specifically the use of the mails to commit fraud or to further a fraud scheme.  I have attended specialized training courses in mail fraud and in gathering and reviewing electronic evidence.  I am presently conducting various investigations of fraudulent investment schemes. Many of the investigations I have conducted have involved electronic evidence, including e-mail records, and I have sworn out search warrants previously.

2.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the following devices (hereinafter, the "Subject Devices"):

   a.  Server formerly located at the premises of Forefront Partners, LLC and its

       affiliated companies (collectively, "Forefront");

    b.   A forensic image of the server described in (a);

    c.   A forensic image of a laptop used to access the server described in (a):

    d.   Office 365 email data;

    e.   A storage device for DropBox data from Reifler;

    f.   A storage device containing general ledgers for Forefront on QuickBooks.

3.      The Subject Devices currently are in the custody of the United States Postal Inspection Service ("USPIS"), at offices located at 1400 New York Avenue NW, Washington DC, 20530.

4.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience, and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5.      Through my investigation, I have uncovered evidence of a scheme by the officers and employees of Forefront, a group of related investment companies located in New York, to defraud North Carolina Mutual Life Insurance Company ("NCM"). Specifically, there is probable cause to believe that Forefront employees and officers, led by Forefront's founder and CEO, Bradley REIFLER, and others, engaged in a scheme to defraud NCM by (1) making materially false representations to NCM, through NCM's investment advisor, about what investments were

2

being made using NCM's trust assets; and (2) misappropriating at least some of the NCM trust assets to repay Forefront's clients who had invested in unrelated investment vehicles. My investigation has also uncovered evidence that REIFLER knowingly destroyed and concealed records and documents related to the scheme with the intent to impede, obstruct, and influence an investigation conducted by the Securities and Exchange Commission ("SEC"), an ongoing grand jury investigation, and the administration of a case filed under Title 11 (a Chapter 7 bankruptcy proceeding).

6.      In sum, based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal criminal law, including but not limited to conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and destruction, alteration, and falsification of records in Federal investigations and bankruptcy, in violation of Title 18, United States Code, Sections 1519 and 1512, have been committed by officers and employees of Forefront, and others. For the reasons set forth below, there is also probable cause to believe that evidence and instrumentalities of these crimes as further described in Attachment B are currently located on the Subject Devices.

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court "is in or for a district . . . in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(i).

## INVESTIGATION AND THE FACTS SUPPORTING PROBABLE CAUSE

### *Background Regarding the NCM Reinsurance Transaction*

8.      NCM is a life insurance company based in Durham, North Carolina.  NCM provides and services life insurance policies.  Steven Fickes had been an actuarial consultant to NCM since 2010.  Fickes testified in an SEC deposition that he approached NCM with the idea of transferring a block of life insurance policies held under a Coinsurance Agreement with a company now known as Markel Bermuda Limited ("Markel") to a special purpose reinsurance company that Fickes formed, Port Royal Reassurance Company SPC ("Port Royal").  Fickes testified that he was the sole owner of Port Royal.

9.      On or about December 19, 2003, NCM and Markel entered into an agreement whereby Markel, as reinsurer, agreed to accept the liabilities and obligations arising from a block of NCM insurance policies.  The Agreement required NCM to pay to Markel premiums received by NCM pursuant to policies in the block.   Markel, in turn, would cover the cost of cash death claims, maturity benefits, and dividend payments paid out by NCM under the policies in the block. The purpose of the agreement was for NCM to transfer portions of its risk portfolio to Markel, whereas Markel was to receive the premiums associated with those accounts.

10.      On or about April 24, 2015, NCM entered into a Novation Agreement with Markel and Port Royal.  Under the Novation Agreement, Port Royal effectively replaced Markel as the reinsurer over the block of policies subject to the 2003 Coinsurance Agreement.

11.      NCM, Port Royal, and Summit Trust signed a Reinsurance Trust Agreement ("Trust Agreement") on or about April 24, 2015.  The Trust Agreement provided that Port Royal was to transfer $34,194,634 in cash into the trust account upon the signing of the agreement.  As

4

explained by NCM Executive 1 to a Postal Inspector with the U.S. Postal Inspection Service during an interview on August 24, 2017, the Novation Agreement and the Reinsurance Trust Agreement resulted in approximately $29 million of this amount being paid directly into the account by Markel, with the remaining amount to be provided via Port Royal.

12.     Under the terms of the Trust Agreement, Port Royal was responsible for reimbursing NCM for cash death claims, maturity benefits, and dividend payments made under the policies covered by Port Royal's Novation Agreement. Accordingly, the Trust Agreement required that Port Royal maintain adequate security for these payments in the form of assets to be held in a trust account for the benefit of NCM. The Trust Agreement named Summit Trust Company the trustee of this account and provided that legal title to the assets in the trust account would be vested in the name of Summit Trust Company for the benefit of NCM. These trust assets would ensure that NCM would have sufficient funds to pay claims to its policyholders.

13.     The Reinsurance Trust Agreement then controlled what could be done with the cash deposited in the trust account. Port Royal was required to maintain assets in the account of a fair market value equal to or greater than a "Statutory Reserves and Liabilities" amount stated in a report provided by NCM to Port Royal on a quarterly basis. The assets in the trust account also needed to qualify as "Eligible Assets," defined in the Reinsurance Trust Agreement as cash or any securities meeting the criteria of investment guidelines provided in a one-page attachment to the agreement. Among other criteria, "Eligible Assets" had to meet all of the requirements of North Carolina's General Statute 58-7-173, and were subject to certain concentration limitations prescribed by the North Carolina Insurance Code. Among other things, eligible assets were limited to income-producing securities and needed to have an average rating of 2 or better based on the

ratings of the National Association of Insurance Commission's ("NAIC") Security Valuation Office (or equivalent rating).

14.     The Trust Agreement permitted Port Royal to appoint an "Investment Manager" to manage investment of the Trust Assets.  Port Royal appointed Stamford Brook Capital, LLC ("Stamford Brook") as investment advisor under the Trust Agreement, which gave Stamford Brook the authority to direct purchases of trust assets.  NCM Executive 1 told a Postal Inspector that he understood Stamford Brook to be a shell company of Forefront's.  Based on the evidence described below, Stamford Brook was in fact operated by Forefront officers and employees, including REIFLER, from the same physical location as Forefront.

### *Forefront, its Expected Role in Managing the Trust Assets, and its Knowledge of the Investment Criteria*

15.     Bradley REIFLER was the founder and CEO of Forefront Partners, LLC, per a declaration he signed under penalty of perjury on October 25, 2016.

16.     David Wasitowski—according to sworn testimony he gave to the SEC—served as the Chief Compliance Officer of at least one entity affiliated with Forefront named Forefront Capital Advisors, LLC.

17.     Michael Flatley testified before the SEC that he was a Managing Director of Forefront starting in 2014.

18.     During an interview conducted on February 13, 2018, Margaret Leszczynska told Postal Inspectors that she was the Office Manager for Forefront.

19.     As described herein, testimony before the SEC and e-mail evidence demonstrates that, by the time that Port Royal assumed responsibility for the NCM trust assets on or about April

24, 2015, it was anticipated that Forefront would select assets to be purchased with the cash initially deposited in the trust account. Evidence uncovered in the investigation indicates that Forefront's officers and employees involved in the selection of assets understood that assets purchased for the trust account had to conform with guidelines attached to both the Trust Agreement and an associated Investment Advisory Agreement.

20.     In sworn testimony before the SEC, Fickes stated that he first was introduced to REIFLER and Flatley in connection with the Trust Agreement in the fall of 2014.

21.     Fickes testified before the SEC that he understood that he was responsible for determining whether proposed investments qualified as "Eligible Assets" under the Trust Agreement. He testified that REIFLER was responsible for locating investment opportunities and bringing them to Fickes, who would then advise on whether they qualified for purchase as trust assets.

22.     Emails I have reviewed indicate that, beginning as early as 2014, REIFLER and Fickes exchanged emails to discuss the details of Forefront's role as investment advisor. For example, on December 3, 2014, Fickes received an email from REIFLER regarding REIFLER's role in the transaction. In his email, REIFLER wrote, "I am conservative and have for the last 30 years made investment decisions that have proved incredibly successful. . . . Our respective skillsets are tied together. I put personal money in every investment I make."

23.     Emails I have reviewed indicate that Fickes, Flatley, REIFLER, and Wasitowski collaborated on drafting an Investment Advisory Agreement between Port Royal and Stamford Brook that contained the same investment guidelines contained in the Trust Agreement.

7

a. For example, on March 24, 2015, Fickes sent a draft of the Trust Agreement to Wasitowski, stating "See the attached Trust Agreement. The investment guidelines are in Exhibit C."

b. On April 1, 2015, Wasitowski emailed a sample "investment management agreement" to Fickes and copying Flatley. Wasitowski wrote, "I propose we use a simple agreement like this updated to reflect the Trust and the investment requirements described in the Trust Agreement."

c. On April 2, 2015, Fickes emailed Wasitowiski, copying REIFLER and Flatley, attaching a draft investment advisory agreement, and writing, "Attached is the first cut at the investment agreement." The draft referenced "guidelines" for the management of the trust assets in "Schedule B," but did not attach the guidelines. Later that same day, Wasitowski, copying Flatley, attached a similar draft of the investment advisory agreement in an email to Fickes, writing, in part, "I made some minor formatting changes and updated jurisdiction to Delaware. I spoke with Brad and we are more comfortable with an advisory fee somewhere in the range of 20-25 basis points." "Brad" is likely a reference to REIFLER.

d. On April 23, 2015, Fickes emailed a draft of an investment advisory agreement to an in-house attorney at NCM, copying an NCM executive and Flatley. The attached .pdf-format draft included the investment guidelines at Schedule B, and Fickes' email stated, "I have added all of the required Schedules. Tomorrow you will get a copy with signatures."

8

24.     On April 24, 2015, Fickes sent a draft letter to Flatley regarding the roles of Stamford Brook and Forefront in the management of assets in the reinsurance trust account (the "Stamford Brook Letter").   The draft Stamford Brook Letter contained a signature block for REIFLER as Chief Executive Officer of Forefront Capital.  Fickes' email stated, "Mike, Please have Brad sign the attached."  That same day, Flatley forwarded an email message to Fickes that attached a .pdf-format document appearing to be a scanned copy of a signed version of the Stamford Brook Letter, which stated the following:

> (1)  Stamford [Brook Capital, LLC] is a wholly owned by me [*sic*].  To date Stamford has no business and is being used as the investment advisor to Port Royal in order to facilitate the anticipated potential future partnership arrangement between Port Royal, Forefront Capital Holdings, LLC ("Forefront Capital") and NCM.

> (2)  Forefront Capital also owns Forefront Capital Markets, LLC ("FFCM"). FFCM is a Registered Investment Advisor with the [SEC].  The same individuals who manage FFCM will manage the investments for Stamford.

This final version of the letter contains a signature over a signature block that bears REIFLER's name and title.  As such, REIFLER appeared to have signed the Stamford Brook Letter sent to NCM.  In testimony before the SEC, REIFLER denied that the signature on this letter was his.

25.     Flatley's April 24, 2015 email attaching this signed Stamford Brook Letter also stated "David's sig to follow."   Fickes testified that he believed that this email referenced Wasitowski's anticipated signature on the Investment Advisory Agreement.

26.     Shortly thereafter that same day—April 24, 2015—Fickes emailed a copy of the Stamford Brook Letter to an NCM executive, copying Flatley, and wrote, "Attached is the Forefront letter concerning the Asset Manager – Stamford Brook.  The signed investment management agreement will follow shortly."

27.     Soon thereafter, still on April 24, 2015, Fickes emailed a fully executed copy of the Investment Advisory Agreement between Port Royal and Stamford Brook to NCM, copying Flatley on his email.

28.     This Investment Advisory Agreement between Stamford Brook and Port Royal set forth the rights and responsibilities of Stamford Brook as Investment Advisor.  Section 1 of the Investment Advisory Agreement provided that Stamford Brook "is authorized to manage and administer the [Trust Account] without prior consultation or approval of [Port Royal]; subject, however, to guidelines as provided by [Port Royal] and set forth on Schedule B attached hereto." Schedule B used the same definition of "Eligible Assets" as set forth in the Trust Agreement, including that the assets had to be income-producing securities and attain a rating of 2 or better pursuant to the NAIC's Security Valuation Office or equivalent rating system.  The Investment Advisory Agreement also provided that "[a]ll notices, instructions and advice with respect to security transactions, or any other matters contemplated by this Agreement" would be considered delivered to Stamford Brook if sent to the attention of David Wasitowski at 7 Times Square, 37th Floor, New York, New York 10022, Forefront's address at that time.

29.     Fickes testified before the SEC that he spoke with Flatley and REIFLER regarding the investment guidelines in the Trust Agreement in or around the time that the Trust Agreement was signed in April 2015.

### *Use of Trust Funds to Purchase Non-Eligible Assets*

30.     The reinsurance trust transaction closed in late April 2015.  On April 27, 2015, in an email with the subject "Closing fees," Fickes wrote REIFLER, copying Flatley, "All is done! Just waiting for the wire transfer to come in."  REIFLER replied to Fickes alone, "When the wire

is in……I will be ecstatic!"  Fickes responded—still on April 27, 2015—"When the wire is in,
please pillage in moderation."

31.     On April 28, 2015, REIFLER emailed Fickes, "WE ARE IN BUSINESS!!!!
MONEY HIT!!! GREAT JOB!." Fickes replied, "SOMETHING WENT WRONG. IT SHOULD
HAVE HIT MY PERSONAL ACCOUNT.  Now I have a non-refundable ticket to Brazil, and no
reason to go." REIFLER responded, "You can still go, but less fun." Fickes then wrote, still on
April 28, 2015, "All of the back-and-forth aside – thanks for hanging tough!"

32.     A statement from Summit Trust Company dated April 1, 2015, to June 30, 2015,
indicates that two cash deposits of $3,250,000 and $29,194,634 hit the Summit Trust Account for
the Port Royal North Carolina Mutual Reassurance Trust on or about April 30, 2015, which meant
that Forefront's officers and employees, including REIFLER, operating through Stamford Brook,
now had control over the assets.

33.     Emails indicate that Forefront communicated with Fickes regarding certain
potential investment opportunities for the trust assets.  For example, on April 29, 2015, Flatley
forwarded information to Fickes regarding a "Forefront Partners bridge loan" to Waterbridge
Capital. The same day, REIFLER forwarded additional information to Fickes regarding this bridge
loan. Fickes replied, "Brad, I need to understand the basic transactions better.  Please have some
[sic] call and explain them."

34.     On June 26, 2015, Fickes requested "a listing of all the insurance portfolio assets"
from Leszczynska and Flatley.  That same day, Fickes received an email from Leszczynska
copying Flatley and attaching an account statement from Summit Trust Company.  The account

statement reflected that cash from the Port Royal North Carolina Mutual Reassurance Trust accounts purchased the following assets:

- A $10 million investment in Forefront Income Trust;

- A $10 million promissory note with Forefront Partners, LLC;

- A $6 million promissory note with Waterbridge Capital, LLC;

- A $1.75 million promissory note with Symmetry Property Development, LLC;

- A $500,000 promissory note with Sully Partners, LLC; and

- A $500,000 promissory note with Auto Funding Group, LLC.

35.    The account statement reflected that the investment in Symmetry Property Development, LLC, occurred on March 9, 2015, over a month prior to the parties entering the Trust Agreement.

36.    In his testimony before the SEC, Fickes stated that he had not approved most of these investments prior to receiving the June 26, 2015, account statement from Forefront.  In particular, Fickes testified that he did not approve the $10 million investment in Forefront Income Trust, nor did he approve the $10 million promissory note with Forefront Partners, LLC.  Fickes also testified that these assets did not meet the investment guidelines in the Trust Agreement and the Investment Advisory Agreement.  As such, REIFLER and others at Forefront used the trust assets without receiving the requisite approval from Fickes, thus resulting in a violation of the agreements designed to protect the trust assets.

37.    Emails demonstrate that, soon after receiving the account statement, Fickes contacted representatives from Forefront, including Flatley and REIFLER, to complain that certain investments were ineligible for purchase with trust assets.  In an email to the Flatley dated June

28, 2015, Fickes asked "can we start looking at how much of FP and FIT investments can be reversed . . . ? These have been keeping me awake at night." The affiant understands "FP" and "FIT" to refer to the $10 million investments in Forefront Partners, LLC and Forefront Income Trust. That same day, Fickes received a response from Flatley stating, "Brad and I will call you early tomorrow. We'll figure something out."

38.     Fickes received an updated account statement from Leszczynska on August 31, 2015. The attached account statement reflected the period from April 1, 2015, to July 29, 2015. As before, the statement contained line items for the $10 million investment in the Forefront Income Trust and a $10 million promissory note with Forefront Partners, LLC, among other investments.

39.     Fickes again alerted various representatives from Forefront that its investments violated the agreements that were designed to protect trust assets. On September 1, 2015, Fickes emailed Flatley, "I do not want to make too big of a deal about it, but we have got to get serious about cleaning up the Forefront Investments. In addition to violating the investment guidelines, as the investments are now being held, those investments violate the investment advisory agreement."

40.     On September 3, 2015, Fickes emailed a prospectus for Forefront Income Trust to Flatley, copying Wasitowski. The email stated, "I have tried to highlighted [sic] the troubling areas in yellow. I got tired of highlighting. . . . Maybe the actual investments are not as bad as the prospects [sic] implies they will be. However, I do think that this investment is trouble."

41.     On September 4, 2015, Fickes emailed Flatley and copied Leszczynska, in an email with the subject: "De-tox." Fickes wrote, in part, "This is a summary of the game plan we

13

discussed yesterday for fixing the investment problem we now have." The email contained a plan for handling the prohibited assets listed in the most recent account statement.

42.     Flatley emailed Fickes on September 25, 2015, stating, "Attached please find the 'strategic plan' for redo on the $20MM in FIT and FFP," which the affiant understands to refer to the investments Forefront Income Trust and Forefront Partners, LLC. The email included as an attachment a document listing new investments to swap with the current investments in Forefront Income Trust and Forefront Partners, LLC.

43.     On September 25, 2015, REIFLER, copying Flatley, sent Fickes an image that appears to show a hand, covered in blood, with the subject line, "Thinking of our morning conversation." Replying to this email on August 25, 2016, over a year later, Fickes wrote: "You are not going to be able to hide from the mess you made. Unfortunately, North Carolina Mutual, Port Royal and Forefront are all tethered on this one. Quit hiding and start helping."

### *Forefront's Substitution of New Assets in the Trust Account*

44.     An email dated October 13, 2015, from Fickes to REIFLER and copying Flatley had as a subject line "Asset Clean-up." The email stated, "Brad, Time is up. I am going to file the second quarter statements with the regulators based on the Summit statements I have as of June 30th. The statements show $10 million of cash going to each of Forefront Income Trust and Forefront Partners. Steve."

45.     Emails show that Fickes received an updated list of investments on October 14, 2015, from Leszczynska, who copied REIFLER and Flatley. The updated list purported to show a longer list of smaller investments—most were valued at $1 million or less—as compared with the $10 million investments in Forefront Income Trust and Forefront Partners, LLC. This list

14

included, among other assets, investments of $1 million each in entities titled We Member LLC, We Work, LLC, Wabash LLC, Carillion Tower LLC, Hilton Tower LLC, Coconut Beach LLC, and Spring Bridge 182. As such, it appeared that the $10 million investment in Forefront Income Trust and $10 million note with Forefront Partners, LLC had been swapped out for a series of smaller investments and, as a result, that Forefront had addressed Fickes' concerns regarding disposition of the trust assets.

46.    Fickes testified before the SEC that, in or around December 2015, he realized that NCM was not receiving account statements related to the trust assets. In an email dated December 8, 2015, Fickes sent NCM account statements dated October 22, 2015. The statement, which purportedly provided a list of replacement assets for the Forefront Income Trust and Forefront Partners, LLC, investments, included a list of investments of $1 million value or less, similar to the account statement received on October 14, 2015.

47.    NCM Executive 1 told a Postal Inspector that, in early 2016, Dixon Hughes Goodman, external auditors for NCM, began an audit of NCM's 2015 financials. In performing the audit, Dixon Hughes Goodman requested backup documentation regarding the value and suitability of the trust assets. NCM Executive 1 also stated that, in mid-2016, NCM commenced an internal audit of the trust assets to determine the acceptability, suitability, and value of the investments.

48.    NCM Executive 1 requested documentation for the audits from Fickes via an email dated April 1, 2016, copying Flatley. The email read, "Please find attached the two initial selections the auditors want to get comfortable with for the audit. The auditors need the following support for each: 1) A copy of the executed agreement supporting the note (including interest rate

15

and terms) [and] 2) Support for the underlying collateral (i.e., contract with telecom company or current appraisal for real estate backed loans)." On April 7, 2016, Fickes sent an email to Leszczynska and Flatley with the subject "Follow-up Information Request." Fickes wrote, "North Carolina Mutual is on me, NCM's auditors are on this. Why is this not done?"

49.    From on or about April 8, 2016, to on or about April 13, 2016, Fickes received several emails from Leszczynska attaching copies of documents purporting to respond to NCM's audits and copying Flatley. These documents included loan agreements, security agreements, and other documentation related to the various investments.

50.    On April 15, 2016, NCM Executive 1 sent an email to Fickes and Flatley stating, "[W]e had our call with the auditors. We called yesterday and this morning leaving messages. The auditors have some concerns that would be rather expensive to overcome, if at all. They have recommended liquidating to cash or other securities that can be confirmed or a letter of credit for the reserve amounts." That same day, Flatley emailed Fickes, "Please call me asap."

51.    Through April and May of 2016, Fickes received emails from Flatley and Leszczynska purporting to send further documents responsive to the audits. Several of these emails copied REIFLER. These emails include, not are not limited, to:

    a.    An email dated May 18, 2016, from Leszczynska to Fickes, copying REIFLER and Flatley, attaching notes and security agreements for four investments for Forefront Talking Capital;

    b.    An email dated May 18, 2016, from Leszczynska to Fickes, copying REIFLER and Flatley, and attaching notes and mortgage notes for investments associated with

801 South Broadway LLC, Hilton Tower LLC, Park Ave LLC, and West 25th Street LLC;

c. An email dated May 21, 2016, from REIFLER to NCM Executive 1, copying Fickes, another NCM email account, and Flatley, stating: "The Cathedral itself is not part of the deal however the property you referred to was owned by the Church (therefore being tax exempt and having an extremely low tax base.) Although the appraisal provided is old, it is very thorough and supports a combined appraisal over 21M. The value has only increased and a similar parcel down the street is being offered at 45M."

52.    During her interview with a Postal Inspector on February 13, 2018, Leszczynska was asked about the Trust Agreement and documentation provided to Fickes.  Leszczynska told the Postal Inspector that all the notes came from REIFLER.  When asked about the emails sent on May 18, 2016, she repeated that everything came from REIFLER.

53.    Some of the supporting documentation that Leszczynska received from REIFLER and sent to Fickes appears to be fraudulent.  For example, on August 11, 2016, Leszczynska sent an email to Fickes, copying Flatley, and attached security agreements and notes for Symmetry Tower Chicago Project Owner LLC Hilton Tower LLC and Symmetry Property Development II LLC/Wasbash LLC.  The documents for Symmetry Property Development II LLC/Wasbash LLC included a Promissory Note and Collateralized Obligation for $1 million signed by "Symmetry Property Development II, LLC/Wabash LLC" as borrower and "Port Royal North Carolina Mutual Reassurance Trust" as lender.  The documents, dated August 27, 2015, purported to contain signatures from Flatley and Jeffrey Laytin ("Laytin"), a member of Symmetry Property

Development.  Laytin told a Postal Inspector that the signatures on these documents were not his and that he believed that they were forged.

54.     REIFLER appears to have been well aware of the importance of this documentation in addressing Fickes' and NCM's concerns regarding the disposition of the trust assets.  Fickes sent several emails to REIFLER inquiring about the status of the trust assets.  In an email to REIFLER dated July 11, 2016, Fickes provided a detailed account of the deficient supporting documentation for the trust investments.  In this email, Fickes reinforced the importance of the "removal of Forefront discretionary authority" and explained that "Forefront needs to replace any loans in the current portfolio which are not in compliance with the investment guidelines of the trust."

55.     On July 22, 2016, REIFLER emailed Fickes and Flatley to suggest "[s]ome ideas to request more time," including the suggestion that REIFLER, Flatley, and Fickes "[m]eet with the internal auditor and review his findings.  Many of his findings deal much more with risk of the portfolio versus citing specific rule violations.  I believe that we can prove to him the safety of the portfolio."

56.     Fickes testified before the SEC that, on or around July 28, 2016, he was reviewing public filings related to the Forefront Income Trust.  While reviewing these filings, he realized that the assets held by the Forefront Income Trust were the same assets held in the trust account.  Fickes testified that, because of this, he understood that he had been misled by Forefront officers and employees into believing that Forefront had "swapped out" the $10 million investments in the Forefront Income Trust and Forefront Partners, LLC, as represented in the most recent account statements.  In an email dated August 1, 2016, to REIFLER and copying Flatley, Fickes stated:

I am going to need to have a discussion with NCM later today to tell them about the Port Royal assets which were found last week residing on Forefront Income Trust's balance sheet. As bad as I thought everything was that Friday in your office, they have taken a turn for the worse.

57.     Soon after, Forefront disavowed any responsibility for the problems underlying the disposition of trust assets. On September 1, 2016, counsel for Forefront sent a letter to counsel for NCM stating that "[t]he investment advisory agreement purportedly entered into between Port Royal and Stamford Brook was never executed. Any document that purports to show a signature on Stamford Brook's behalf is a forgery," and, furthermore, that "[t]he letter dated April 24, 2015 that purports to be on letterhead of Forefront Capital Holdings and signed by Bradley Reifler . . . is a forgery and fabricated letterhead."

58.     Forefront operates various investment programs, including a short-term note product under which individual investors lend money to Forefront in exchange for a percentage-based interest payment. Leszczynska told Postal Inspectors that Forefront used funds received from the Port Royal Summit Trust account to repay investors in the various Forefront investment products, *i.e.*, Forefront misappropriated NCM trust assets to pay off unrelated Forefront investors. Further, my review of bank account statements for the various Forefront entities indicates that cash received by Forefront from Summit Trust was used soon thereafter to repay other individuals and entities involved with various Forefront investment vehicles unrelated to NCM.

### *REIFLER's Obstruction*

59.     On September 23, 2016, NCM filed a complaint in the United States District Court for the Middle District of North Carolina, Durham Division, against defendants Stamford Brook Capital, LLC, Forefront Capital Holdings, LLC, Forefront Capital, LLC, Port Royal Reassurance

Company SPC, LTD., Summit Trust Company, Bradley REIFLER, and Michael Flatley, asserting, among other things, breach of contract, breach of fiduciary duty, and fraud. NCM's complaint alleged that the defendants "fail[ed] to invest and hold North Carolina Mutual's assets in compliance with North Carolina law and applicable agreements," and that the defendants "provide[d] North Carolina Mutual with conflicting information and documents regarding North Carolina Mutual's investments." *North Carolina Mutual Life Ins. Co. v. Stamford Brook Capital, LLC*, 1:16-cv-1174-LCB-JEP (the "Civil Litigation").

60.     On January 20, 2017, REIFLER filed a voluntary petition for bankruptcy under Chapter 7 in the United States Bankruptcy Court for the Southern District of New York. *In re Bradley C. Reifler*, Case No. 17-35075. On January 27, 2017, the District Court in the Civil Litigation entered an order administratively terminating the action against REIFLER, effectively staying the matter.

61.     On May 1, 2017, NCM filed an adversary proceeding in the Bankruptcy Proceeding opposing the dischargeability of REIFLER's debts in his Chapter 7 bankruptcy based upon facts similar to those alleged in the Civil Litigation. *In re: Bradley C. Reifler*, Adv. Pro. No. 17-09016 ("NCM Adversary Proceeding"). NCM alleged that REIFLER and Forefront "used false documentation and deception to transfer the trust funds through unauthorized loans to themselves and for other unauthorized investments in which they were personally interested, in clear violation of the law."

62.     On December 28, 2017, the judge in the NCM Adversary Proceeding ordered that REIFLER produce certain ESI to counsel for NCM, in particular:

> A full list of all Electronic Devices . . . within [Reifler's] possession, custody or control; the owners and/or custodians of the Electronic Devices . . .; the locations at which each of the Electronic Devices has been used . . .; a list of all Electronic Devices owned, or in the possession, custody or control of the Debtor within the past five years of which the Debtor no longer has possession, custody or control, the date on which the Electronic Device was no longer in the Debtor's possession, custody or control and the circumstances leading to the Debtor no longer being in possession, custody of control of the Electronic Devices; and a full list of all email addresses and accounts which the Debtor has owned and/or utilized within the past five years . . . , as well as any information (including passwords) needed to access the Email Accounts and any date contained within those accounts[.]

63.     In this Order, the Bankruptcy Court also ordered that REIFLER "produce and/or provide access for inspection and imaging to RVM enterprises, . . . a qualified third-party vendor retained by North Carolina Mutual (or such other qualified vendor as may be designated by North Carolina Mutual) . . ., any and all computers, laptops, hard drives, tablets, notebooks, netbooks, phones, smart devices, personal digital assistants, workstations, servers, and/or other electronic devices capable of storing electronic data . . . within the Debtor's possession, custody, or control, or with respect to which the Debtor has or can obtain access, for the purpose of full forensic examination and data collection."

64.     On January 5, 2018, REIFLER's bankruptcy counsel provided NCM a list of electronic devices compiled by REIFLER.  REIFLER's bankruptcy counsel stated "that the devices on said list are all currently located at the debtor's office, located at 641 Lexington Avenue, 29th Floor, New York, NY 10022."  The list included the following items: REIFLER's Hewlett Packard computer; REIFLER's personal cellular telephone (iPhone); REIFLER's Apple watch; REIFLER's custom-built work computer; a work computer used by an assistant; and an unknown number of computers no longer in REIFLER's possession and left at Forefront's former offices.

65.     A sworn declaration submitted on January 16, 2018, in the NCM Adversary Proceeding by an employee of the vendor retained by NCM (the "ESI Vendor"), alleged that, on January 11, 2018, the ESI Vendor attempted to collect data from the REIFLER's list of devices at REIFLER's office.  The ESI Vendor stated that he began the process by imaging REIFLER's cellular phone and a computer that contained three hard drives.  The ESI Vendor stated that REIFLER identified a computer listed on REIFLER's list of devices but indicated that the computer lacked a hard drive.

66.     REIFLER refused to comply with the Bankruptcy Court's order.  During the imaging, the ESI Vendor identified an additional computer outside of REIFLER's office bearing a serial number that matched a computer identified on REIFLER's list of devices.  The ESI Vendor asked an assistant about the computer, who then contacted REIFLER and returned with a phone call from REIFLER for the ESI Vendor.  In his sworn declaration, the ESI Vendor stated that REIFLER, "told me to 'pack my shit up and get out,' and that I had five minutes to leave."  The ESI Vendor left having only obtained a forensic image of the phone and one of the hard drives from one of REIFLER's computers.

67.     On February 6, 2018, the Bankruptcy Court issued an order finding REIFLER in contempt for his "ongoing and willful violation of [the] ESI Order and acting in bad faith."

68.     In a sworn declaration submitted in the NCM Adversary Proceeding on March 5, 2018, the ESI Vendor stated that he made a second attempt to collect REIFLER's electronic devices on February 14, 2018.  At this time, he recovered REIFLER's custom-built work computer.  Forensic analysis of this computer reveals that, on January 2, 2018, after entry of the Bankruptcy Court's first discovery order, REIFLER used this computer to search the phrase

"permanently deleting deleted emails on SSD" using Google. SSD stands for "Solid State Drive," a type of hard drive used to save information on computers. Shortly after this search, REIFLER downloaded the application Eraser, which can be used to delete and overwrite files.

69.     Forensic analysis of the computer also revealed various devices "which are ESI repositories, were connected to, or used in connection with the Custom Computer, none of which were included on the First Device List or the subsequent lists and none of which were provided to RVM for access or collection." These devices included three cloud-based storage accounts; sixteen email addresses; an offsite email archival storage service; four chat and messaging applications; a physical server mapped to REIFLER's custom computer; and eighteen removable storage devices.

70.     On April 4, 2018, the ESI Vendor submitted another sworn declaration in the NCM Adversary Proceeding that provided results from analysis of REIFLER's mobile phone and two computers. The analysis demonstrated, among other things, that:

  e.  On December 20, 2017, REIFLER searched "erasing phone email and text history" on Google and visited a webpage titled "How to Permanently Delete Text Messages on Your iPhone";

  f.  On December 20, 2017, REIFLER searched "how to erase all emails on iphone" on Google and visited a webpage titled "How to Trash All Your Emails on Your iPhone, iPad, or iPod Touch";

  g.  On January 2, 2018, REIFLER searched "erase deletes" on Google and visited a blog post titled "10 Free Tools to Permanently Delete Files and Prevent Data Recovery"; and

23

h. On January 2, 2018, REIFLER visited webpages titled "Deleting Files/Data from SSD Permanently", "Why Deleting Files Can be Recovered, and How You can Prevent It", and "How to really erase any drive—even SSDs—in 2016".

71.    By December 20, 2017, REIFLER was well aware that Forefront was under investigation by the SEC.  He had already appeared for three days of testimony before the SEC related to Forefront's various investment programs and the Trust Agreement on October 27, 2016, September 11, 2017, and September 12, 2017.

72.    The sworn declaration submitted on April 4, 2018, also provided an analysis of text messages retrieved from REIFLER's phone.  In one exchange, REIFLER texted Angel Santos, an Information Technology administrator at Forefront, on December 26, 2017.  REIFLER stated, "I want to delete all emails from 2016 onback [*sic*].  I can do it . . .  The security may issue may make me take all of them off . . . still checking."  Santos responded, "I can remote into your computer."  To this, REIFLER replied, "np . . . willdo [*sic*] it tomorrow.  Server can be culprit of security breach.  let's discuss when you get back."

73.    I interviewed Santos on March 8, 2018.  During that interview, Santos told me that he began working for Forefront Income Trust in 2009 and was employed through January 31, 2018, as an Information Technology administrator.  During the interview, Santos stated that REIFLER never asked him whether he knew how to permanently delete files from his computer and that he did not think REIFLER would have asked him such a question as REIFLER knew Santos would not have done so.

74.    The sworn declaration submitted on April 4, 2018, also provided analysis of REIFLER's email activity.  On December 28, 2017, REIFLER attempted to delete Microsoft

24

Outlook email folders titled "Water Joel emails"; "Joel"; and "North Carolina Mutual." The affiant understands "Joel" to reference "Joel Schreiber," one of the signatories on several notes associated with the disposition of trust assets.

75.     The sworn declaration submitted on April 4, 2018, provided that, on January 2, 2018, REIFLER attempted to delete Microsoft Outlook email folders titled "Deleted Items"; "Summit Trust; George and K . . . ."; and "Inbox." Further, between December 19, 2017, and February 14, 2018, REIFLER deleted 2,454 emails, including a December 3, 2014, email from REIFLER to Fickes, which REIFLER had forwarded to himself on January 16, 2018.

76.     The sworn declaration submitted on April 4, 2018, also provided an analysis of REIFLER's file deletion efforts. On January 2, 2018, REIFLER moved 236 emails to his computer's recycle bin, including the following files, "Investment Advisory Agreement Steve Ficus [sic]", "Port Royal Investments", "Review of NCM Proposal", and "FIT Holdings with Descriptions."

77.     On May 4, 2018, the Bankruptcy Court issued an order finding REIFLER in contempt and entering a default judgment against him. The Bankruptcy Court found that REIFLER "continued to be in ongoing and willful violation of this Court's ESI Order and the First Sanctions Order and is acting in bad faith," that REIFLER's "dilatory tactics gave him time to research the means and manners to conceal, destroy and spoliate ESI," and that REIFLER "engaged in an intentional and directed campaign to permanently delete, erase and spoliate ESI relevant to the Adversary Proceeding from his Electronic Devices."

### *The Government's Receipt of Electronic Devices*

78.     On February 20, 2018, REIFLER, Wasitowski, and Forefront Capital Holdings, LLC, were served with grand jury subpoenas requesting documents in connection with this investigation.  On March 6, 2018, Flatley also was served with a grand jury subpoena.

79.     Upon learning of REIFLER's attempts to delete data in connection with the NCM Adversary Proceeding, Department of Justice prosecutors (the "DOJ") contacted Forefront counsel in or around March 2018.  In these discussions, Forefront counsel agreed to create a forensic image of the Forefront server and other electronic devices located at the Forefront premises in response to the DOJ's concerns regarding spoliation of evidence.  Through these discussions with Forefront counsel, the DOJ learned that Forefront planned on vacating its offices, then located at 641 Lexington Avenue, New York, New York, 10022 (the "Forefront Office"), in short order.

80.     At this time, the investigative team also continued to receive additional information regarding REIFLER's deletion efforts related to the Bankruptcy Proceeding.  As such, the investigative team applied for search warrants for the Forefront Office and REIFLER's home property, located at Sky Blue Farm, 123 Fraleigh Hill Road, Millbrook, New York, 12545.  On April 12, 2018, Magistrate Judge Robert W. Lehrburger of the United States District Court for the Southern District of New York issued search warrants, which were executed that same day.  Judge Lehrburger found that there was probable cause to search both premises for electronic data and documents, electronic conversations, internet conversations to include messages and chats, text messages, files, images, and calendar entries, computers, storage media, routers, modems, and network equipment.  Judge Lehrburger also found that there was probable cause to search the Forefront Office for documents, records, and accounting statements.  Pursuant to these search

warrants, the DOJ obtained paper records, electronic media, and electronic devices. Processing and analysis of these materials is ongoing.

81.     Because Forefront was in the process of vacating the Forefront Office, many of the electronic devices for which Judge Lehrburger had found probable cause, including devices that may have been subject to REIFLER's deletion efforts, had already been removed from the premises and could not be obtained through the search warrant.

82.     Subsequent to the searches, Forefront Counsel produced twenty-five electronic devices to the investigative team. The full list of devices included electronic devices and information associated with REIFLER and/or Forefront that were not recovered through the search warrants.

83.     Of these twenty-five devices, there are six Subject Devices. The Subject Devices include:

    a.   Server formerly located at the Forefront Office;

    b.   A forensic image of the server described in (a);

    c.   A forensic image of a laptop used to access the server described in (a):

    d.   Office 365 email data;

    e.   A storage device for DropBox data from REIFLER;

    f.   A storage device containing general ledgers for Forefront on QuickBooks.

84.     In a deposition related to the NCM Adversary Proceeding, Leszczynska stated that the Forefront server was located on site, at the Forefront Office, and that Forefront documents and emails were stored on the server. Counsel for Forefront indicated that the Forefront server was still located at the Forefront offices as late as April 9, 2018, at which time it was collected by an

information technology vendor for imaging.  As such, the server, the forensic image of the server, and the forensic image of the laptop used to access the server likely contain information and documentation pertaining to recent Forefront operations, including but not limited to the Trust Agreement.

85.     Office 365 is a Microsoft product that offers various business software, including the email service Microsoft Outlook.  In her deposition, Leszczynska stated that Forefront used Office 365 for cloud-based storage.  In addition, Santos stated that Forefront Income Trust had purchased the Office 365 program for archiving information on the cloud.[1]  In his sworn declaration, the ESI Vendor explained that REIFLER had deleted emails from Microsoft Outlook. As such, Office 365 email data likely contains information related to Forefront operations, including communications by REIFLER, Flatley, Wasitowski, and Leszczynska on Microsoft Outlook related to the conduct described herein.[2]

86.     DropBox is a file-hosting service that allows users to store electronic information and documents on the cloud.  Emails demonstrate that REIFLER used DropBox to store documents related to the Trust Agreement.  For example, when communicating about an appraisal regarding one of the purported trust assets, REIFLER stated, in an email sent on May 21, 2016 to NCM Executive 1, Fickes, Flatley, and Leszczynska, "I believe this in the Dropbox from yesterday but

---

[1] "Cloud computing" refers to storage of electronic information over a network, often the Internet.

[2] Based on current information received over the course of this investigation, I do not understand Forefront to have many employees beyond those listed in this affidavit.  Under oath, Flatley described Forefront as a small company.  As such, I believe a large portion of the emails stored on Office 365 will belong to REIFLER and other Forefront employees listed in this affidavit.

please find the appraisal attached." Emails also demonstrate that Forefront employees used DropBox to share files. For example, on March 4, 2016, Flatley received an automated email from DropBox that REIFLER had sent him a file entitled, "TALKING CAPITAL – PRESENTATION 2016," using DropBox services. Talking Capital was one of the investments connected to the trust assets. In her deposition, Leszczynska recalled that deeds and properties that Forefront shared with NCM during the audit were stored on Forefront's DropBox. In addition, during his SEC testimony, REIFLER stated that he stored Forefront information, including valuations, on DropBox and used DropBox to send this information. As such, REIFLER's DropBox data likely contains information related to Forefront operations as well as documents pertaining to Forefront's involvement in the Trust Agreement and use of the trust assets.

87. QuickBooks is an accounting software package. Wasitowski testified before the SEC that QuickBooks is the accounting system used at Forefront. As such, Forefront's QuickBooks data likely contains information related to Forefront's finances, including but not limited to Forefront's receipt and use of funds related to the Trust Agreement.

88. The DOJ received the Subject Devices in or around April 2018. The Subject Devices are currently in the custody of USPIS and are located at 1400 New York Avenue NW, Washington DC, 20530.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS AND PROBABLE CAUSE JUSTIFYING SEARCH OF THE SUBJECT DEVICES

89. As described above and in Attachment B, this application seeks permission to search for information that might be found within the Subject Devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this

investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Subject Devices for at least the following reasons:

a.    Individuals who engage in criminal activity, including conspiracy, mail and wire fraud, and destruction, alteration, and falsification of records, use digital devices, like the Subject Devices, to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Subject Devices, documents and records relating to their illegal activity, which can include email correspondence; contact information of coconspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, and telephone numbers; and records of illegal transactions, to, among other things, (1) keep track of coconspirator's contact information; (2) keep a record of illegal transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store data for future exploitation.

b.    Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.    Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no

cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space—for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

90.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the Subject Devices were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices,

I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Subject Devices at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Subject Devices, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other

32

locations.    Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.    Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.    Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not

33

present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

   f. I know that when an individual uses a digital device to engage in conspiracy, mail and wire fraud, and destruction, alteration, and falsification of records, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## <u>METHODS TO BE USED TO SEARCH THE SUBJECT DEVICES</u>

  91. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

   a. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices—whether, for example, desktop computers, mobile devices, or portable storage devices—may be customized with a vast array of software applications, each generating a particular form of

information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

35

d.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.     Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.     Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic

37

examination of the devices.  In light of these difficulties, I request permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

      g.   In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

      1.   The Subject Devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

      2.   The analysis of the contents of the Subject Devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

      3.   In searching the Subject Devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as

to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Subject Devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

92.     Because forensic examiners will be conducting their search of the Subject Devices in a law enforcement setting over a potentially prolonged period of time, I respectfully submit good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## REQUEST FOR SEALING

93.     It is respectfully requested that this Court issue an order sealing, for a period of 90 days until August 23, 2018, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation involving, among other things, suspected obstruction activities. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation, could lead to further deletion and spoliation of potential evidence, and may severely jeopardize the investigation's effectiveness.

## **CONCLUSION**

94.     Based upon the information above, I have probable cause to believe that the Subject Devices contain evidence, fruits, and instrumentalities of a conspiracy, in violation of Title 18, United States Code, Sections 371 and 1349; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, and destruction, alteration, or falsification of records in Federal investigations and bankruptcy, under Title 18, United States Code, Sections 1519 and 1512.  Therefore, I respectfully request that the Court issue a search warrant to search the Subject Devices for the evidence described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Bryan Masmela
United States Postal Inspector

Subscribed and sworn to before me on _____MAY 25_____, 2018

Honorable
UNITED STATES MAGISTRATE JUDGE



## ATTACHMENT A

### Devices to Be Searched

The devices to be searched include the following devices currently located in the custody of

United States Postal Inspection Service at 1400 New York Avenue NW, Washington DC, 20530:

  a.  Server formerly located at the Forefront Office;

  b.  A forensic image of the server described in (a);

  c.  A forensic image of a laptop used to access the server described in (a):

  d.  Office 365 email data;

  e.  A storage device for DropBox data from REIFLER;

  f.  A storage device containing general ledgers for Forefront on QuickBooks.

## ATTACHMENT B

**I.    Information to be seized by the government**

The items to be seized include the following evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371, 1341, 1343, 1349, 1512, and 1519 between September 1, 2014, and present, described as follows:

1. All data, documents, records, accounting statements, electronic mail, internet conversations to include messages and chats, text messages, files, images, and calendar entries relating to the following:

   a.  North Carolina Mutual Life Insurance Company, including the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement;

   b.  The trust assets held or purported to be held pursuant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement and any related investments or collateral;

   c.  The external and internal audit of the trust assets held or purported to be held pursuant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement and Investment Advisory Agreement, to include any communications with or concerning the North Carolina Department of Insurance and Dixon Hughes;

   d.  The Forefront short-term note program and any investments related thereto;

   e.  Any records bearing on the validity of the signatures on the Investment Advisory Agreement, Stamford Brook Letter, promissory notes, security agreements, and any

2

other signed agreements relevant to the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement;

f.   Any motive to enter into the North Carolina Mutual Life Insurance Company Reinsurance Trust Agreement or defraud any parties connected thereto, including but not limited to the financial condition and liquidity of Forefront or its principals;

g.   Any attempts to delete, conceal, or otherwise withhold records and data, to include Electronically Stored Information, related to the SEC investigation and bankruptcy proceedings involving Bradley REIFLER, and the foregoing matters, and any other attempts to obstruct a Federal proceeding.

2.   Evidence of who used, owned, or controlled the Subject Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

3.   Evidence of software that would allow others to control the Subject Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

4.   Evidence of the lack of such malicious software;

5.   Evidence indicating how and when the Subject Devices were accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

3

6. Evidence indicating the Subject Devices user's state of mind as it relates to the crime under investigation;

7. Evidence of the attachment to the Subject Devices of other storage devices or similar containers for electronic evidence;

8. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Subject Devices;

9. Evidence of the times the Subject Devices were used;

10. Passwords, encryption keys, and other access devices that may be necessary to access the Subject Devices;

11. Records of or information about Internet Protocol addresses used by the Subject Devices;

12. records of or information about the Subject Devices' Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

13. Contextual information necessary to understand the evidence described in this attachment.

   As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## II.   Procedures

With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (i.e., the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

If, during the review of the seized material, the review team finds potentially privileged materials, the review team will:  (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

RECEIVED

DEC 1 9 2018

Clerk, U.S. District and
Bankruptcy Courts

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF Select Electronic Devices, Storage Units, and Databases Currently in the Possession of the United States Postal Inspection Service | Case No. 1:18—sw—00135<br><br>Filed Under Seal |

## GOVERNMENT'S UPDATE AS TO STATUS OF SEARCH WARRANT EXECUTION

The government, by and through its undersigned attorney, hereby submits this update regarding a search warrant obtained in the United States District Court for the District of Columbia in May 2018. The government is investigating a scheme wherein officers and employees of Forefront Partners, LLP and its affiliated companies ("Forefront"), a group of related investment companies located in New York, conspired to defraud North Carolina Mutual Life Insurance Company ("NCM"). In April 2018, the government received a voluntary production from Forefront's counsel containing the server formerly located at the Forefront offices and hard drives containing images of certain electronic devices belonging to Forefront's founder and CEO, Bradley Reifler, or otherwise associated with Forefront. These items were delivered to the government on or about April 17, 2018, and stored by the United States Postal Inspection Service ("USPIS") at its facilities in Washington, DC. At the government's request, Forefront's counsel sent an inventory of items on the hard drives.

Despite the voluntary nature of the production, out of an abundance of caution, the government chose not to open the devices until a search warrant was obtained for their contents. The government applied for and was granted such a warrant. *See* Exhibit 1. The affidavit in support of the application for a search warrant referenced specific items on the inventory, to include the stand-alone server ("the Server"); a forensic image of the server; a forensic image of a

laptop used to access the server; Office 365 email data; a storage device for DropBox data from Reifler; and a storage device containing general ledgers for Forefront on QuickBooks. The list of items to be searched in the affidavit was based on the inventory received from Forefront's counsel, which included line items for "Server (Haystack image)"; "Haystack image of laptop used to access server"; "Office365 email data"; "B. Reifler DropBox data"; and "QuickBooks (general ledgers)." As such, other than the Server itself, each item referenced in the affidavit correlated to a line item in the inventory.

The search warrant was sworn out before United States Magistrate Judge G. Michael Harvey in the United States District Court for the District of Columbia on May 25, 2018. Upon Judge Harvey's issuance of the search warrant, USPIS analysts opened the devices and learned that they were not organized according to the inventory submitted by counsel. As such, it was impossible to determine which files on the devices corresponded to which items on the inventory and, therefore, which items the search warrant authorized the government to search and seize.

As a result, the government intends to continue to execute the search warrant only as to the Server, which is easily identifiable as the only stand-alone item provided to the governnment in the voluntary production. The government does not intend, at the moment, to continue executing the search warrant as to the other devices, in part because the inventory and the contents of the devices appear to be inconsistent. Should the government elect to resume executing the search warrant as to the other devices, the government will apprise the Court at the earliest opportunity.

Respectfully submitted,

SANDRA L. MOSER
Acting Chief, Fraud Section

BY:    */s/ Michelle Pascucci*
        Michelle Pascucci
        Trial Attorney
        Criminal Division, Fraud Section
        United States Department of Justice
        1400 New York Avenue NW
        Washington, DC 20005
        Tel: (202) 307-2208
        Fax: (202) 514-0152
        Michelle.Pascucci@usdoj.gov

3